UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No.:   20-cr-232(1) (JRT/KMM) |
| Plaintiff, | |
| v. | **DEFENDANT RUSSELL J. RAHM'S SENTENCING MEMORANDUM** |
| Russell J. Rahm, | |
| Defendant. | |

Defendant Russell (Rusty) Rahm submits this Memorandum for the Court's consideration in imposing an appropriate sentence in this case.

### **Introduction**

Mr. Rahm has accepted full responsibility for his role in this offense and greatly regrets his involvement. This is a serious case in which many people suffered financial loss. The question now before the Court is the appropriate sentence for Mr. Rahm. Mr. Rahm has significant health issues arising from a stroke he incurred before the indictment that make him unique in this case and likely very rare among defendants in federal criminal cases generally.

Mr. Rahm is entirely dependent upon caregivers that would not be available to him in federal prison. He takes medicines that prevent seizures and treat other issues caused by his stroke that, if not timely taken, can result in seizures, falls, or other serious problems. He has already experienced the failure to get his medicine while in a very short incarceration in this case that resulted in a seizure and hospitalization. Finally, he is reliant on a scooter and other physical tools, such as handrails, to get around and accomplish basic human tasks like eating, bathing, and going to the bathroom. Mr.

1

Rahm presents Declarations from his caregivers and experts on health care in incarceration as a part of this Memorandum.

## Background Facts

*Personal History*

Mr. Rahm grew up in Iowa. Some of his experiences growing up were positive, for example, enjoying time in the summer at his grandmother's cabin in Minnesota. But his childhood and adolescent years were marred by his parents' marital difficulties and sexual abuse by a girlfriend of his father. He witnessed physical abuse between his parents, who divorced when Mr. Rahm was six years old. His father was a Vietnam Veteran who was shot in the head and returned as a paraplegic. His father also served time in jail in Canada for attempting to bring narcotics into the United States.

When he was a teenager, Mr. Rahm had educational difficulties and moved in with his father. He witnessed verbal and physical abuse between his father and his father's girlfriends. When Mr. Rahm was only 14 years old, one of these girlfriends approached him and engaged in sexual intercourse with him. This occurred multiple times over a two-year period. Incidents of abuse continued, with Mr. Rahm witnessing his father's new wife pushing his father out of his wheelchair, pouring gasoline on him, and threatening Mr. Rahm if he attempted to intervene.

Mr. Rahm left high school in his junior year, eventually getting a job selling magazine subscriptions over the phone for a company in Iowa. He started his own magazine subscription business, ultimately moving to the Kansas City area. He got married and had two children, who are both now adults.

*Health Issues*

Mr. Rahm has submitted Declarations from three of his caregivers: his sister, Bridget Vitali; his daughter, Casey Rahm; and his professional caregiver, Jenn Selph. (See Doc. 2879). These

65154508v3

describe in some detail the health and personal care challenges that Mr. Rahm has and will continue to have for the rest of his life. We have not repeated all those facts below but incorporate them. In addition, there are relevant facts and expert opinions set out in the Declarations of Dr. Brent Gibson, M.D., and former Federal Bureau of Prisons Regional Director, Nicole English. (See Doc. 2879). Mr. Rahm's mother, Kathleen Riley, has also submitted a Declaration. *Id.*

On March 5, 2019, approximately 20 months before the indictment in this case, Mr. Rahm suffered a massive ischemic stroke[1] in his hotel room while attending a business conference in Las Vegas. He fell between the bed and the wall in his room and was unable to call for help. He was not discovered for approximately 18 hours and was unresponsive. After being taken to the emergency room and placed in the Intensive Care Unit, he suffered a series of episodes of cardiac arrest. The stroke has resulted in left-sided paralysis and cognitive deficits that continue to today. In addition, because his left arm had been stuck in an unusual position for 18 hours, he had nerve damage, brachial plexopathy[2], that further limits Mr. Rahm's ability to use his left arm.

After being discharged from the hospital in Las Vegas and returning to the Kansas City area, Mr. Rahm has gone through extensive treatments, including physical and psychological therapy. Initially, for about three weeks, he had inpatient rehabilitation at the KU Acute Rehabilitation Center. Following his discharge, he had therapy for eight hours a day at Ability KC Outpatient Rehabilitation Center that included speech therapy, occupational therapy, physical therapy, recreational therapy, vision therapy, and mental health therapy. While there has been some improvement in adapting to some of his limitations, he is still severely limited in his ability to perform basic tasks and is reliant on multiple caregivers to get through his day.

---

[1] An ischemic stroke occurs when a blood clot blocks or plugs an artery leading to the brain.

[2] Brachial plexopathy is a form of nerve damage affecting his shoulder and arm that severely limits upper limb function.

3

65154508v3

The Declarations from his professional caregiver, as well as from his sister and daughter who also assist him on a regular basis, show both the changes that have been caused by the stroke, as well as his current limitations and needs.

Both his sister, Ms. Vitali, and his daughter, Ms. Rahm, say that before the stroke, Mr. Rahm was active, self-sufficient, and involved in his family, including helping to take care of both his mother and father. Ms. Vitali notes that he could perform calculations in his head faster than anyone she had seen.

Their observations post-stroke are entirely different.

Mr. Rahm requires assistance to eat, bathe, get dressed, go to the bathroom, remember his medications, and get to appointments. Literally all the tasks that are essential for all of us to get through the day. Even for moving from one point to another, he requires the assistance of a motorized wheelchair if it would require walking more than about 30 feet. When he can walk, he needs a special cane and ambulates slowly.

For eating, he cannot cut food because he can only use his right hand. He cannot carry a plate or cup because he has to use a cane in the one hand that is available to him. For showering, he cannot stand for long periods without the risk of falling, so he uses a chair. With one hand, it is virtually impossible to dress himself; socks, for example, are impossible.

The nerve damage has severely limited his ability to be able to wait to go to the bathroom when the need arises. His inability to move quickly also affects this situation, resulting in instances of soiling himself if there isn't someone who can help him get to the bathroom on time. He keeps two urinals on his nightstand. With only one hand that he can use, he cannot empty them himself because he cannot carry them and use his cane at the same time. It is the first thing that either Ms. Selph or Ms. Vitali do when they arrive in the morning.

He is at constant risk of falling. In fact, in 2020, Mr. Rahm fell out of a golf cart he had used for transportation and broke his hip, which has further impaired his ability to walk.

The effects are not entirely physical, he has suffered mental impairment as well. He suffers from "Left Neglect", which results in problems processing things on the left side. For example, he may only eat food on the right side of the plate or miss the fork if it is on the left side. In addition, he has trouble remembering when to take medications, so he uses multiple alarms and reminders from his caregivers. He can no longer do the math calculations that had been so easy before. He confuses time periods. Mr. Rahm also continues to experience seizures.

Taking his medications regularly and on time is critical to his ability to avoid seizures and to help maintain his physical condition, limited as it is. In addition, Mr. Rahm always has a single dose of a nasal spray, Nayzalim, with him. If he senses that he is about to have a seizure, he can use it to stop or shorten the seizure. According to Dr Gibson, Nayzalim is a controlled substance and subject to diversion in prison. As a result, the BOP may not permit him to keep the Nayzalim with him, further increasing the risk of a serious seizure. (Doc. 2879, Dr. Gibson Report at p. 11).

A good example of what happens when he does not get his anti-seizure medicine occurred in this case. When Mr. Rahm was arrested on October 27, 2020, at a little after 8 a.m. by federal agents in this case, they took him into custody and placed him in the Sugar Creek, Missouri, jail pending his initial appearance. Despite being told of the importance of his medicine, the jail did not give him his medications and he experienced a seizure that required him to be hospitalized at Centerpoint Medical Center in Independence, Missouri. In fact, his initial appearance in this case occurred virtually while Mr. Rahm was in his hospital bed and counsel sat on the edge of that bed.[3]

---

[3] Mr. Rahm wants to thank United States Magistrate Judge Becky R. Thorson, who agreed to conduct the hearing on short notice after the Magistrate in Kansas could not. This allowed Mr. Rahm to be discharged to his home following his stay in the hospital, rather than being returned to Sugar Creek. (See Doc. 101).

65154508v3

Mr. Rahm continues to go to physical therapy and occasional mental therapy. He has learned strategies for dealing with certain issues – such as the "left neglect", but they still affect him. He suffers from muscle tightness in his left arm and hand and receives periodic botox shots to try and relax them. He also has the opportunity to participate in new treatments that could improve his abilities. In fact, he has been approved for a new treatment at the KU Medical Center in which electrical stimulants are implanted to possibly aid in rehabilitation of his left arm.

*Facts of the Offense*

The facts of this case are fairly set out in the Presentence Investigation Report. Mr. Rahm regrets his role in this offense and accepts responsibility for it.

## **Appropriate Sentence**

18 U.S.C. § 3553 requires a sentencing court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the four purposes of federal sentencing. 18 U.S.C. § 3553(a). Those four purposes are the need for the sentence imposed: (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553 requires district courts to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). *See* 18 U.S.C. § 3553(a)(1)-(7).

65154508v3

Given the permanent effects from the stroke he incurred in 2019 and the very real health risks that he faces if incarcerated, Mr. Rahm asks the Court to consider a sentence that is sufficient but not greater than necessary as follows: custody of the United States Bureau of Prisons ("BOP") to be imprisoned for a total term of time served as to Count 1; supervised release for a term of five (5) years—the maximum permissible under Count I—with five years of home confinement during the period of supervised release, as opposed to incarceration in the Federal Bureau of Prisons; $103,189,961 in restitution; forfeiture of the property and assets as more fully described in ECF Doc. 2691; and a $100 special assessment. Alternatively, if the Court believes it can lawfully impose a sentence of probation, that the Court impose a sentence of probation, with a condition of home confinement, at whatever length the Court believes appropriate.

Mr. Rahm acknowledges that home confinement would not ordinarily be appropriate for an offense of this type and his role in it, but the significant risks posed by typical incarceration would result in a sentence that imposes a penalty far beyond what is necessary in this case. "A defendant can be sentenced to a term of probation of up to five years for a felony offense. 18 U.S.C. § 3561(c). The court may impose conditions of probation, including residence at a 'community corrections facility ... for all or part of their term of probation.' *Id.* § 3563. The Guidelines echo the statute stating, '[r]esidence in a community treatment center, halfway house or similar facility may be imposed as a condition of probation.' U.S. Sentencing Guidelines Manual § 5B1.3(e)(1) (2007)." *United States v. McFarlin*, 535 F.3d 808, 811–12 (8th Cir. 2008).

The statutory goals and guidance of § 3553 can be satisfied by something less than confinement with the BOP. *See, e.g., McFarlin*, 535 F.3d at 810–12 (variance to a sentence of probation was warranted in part based on the defendant's "poor health" and "need for medical care").

7

In support of that requested sentence, Mr. Rahm respectfully submits his analysis of the 3553(a) factors:

*Nature and Circumstances of the Offense and History and Characteristics of the Defendant.* 18 U.S.C. § 3553(a)(1).

By this time, the Court is well aware of the facts and circumstances of this case. Mr. Rahm has acknowledged the seriousness of it and his role in it. Mr. Rahm cooperated with the United States Attorney's Office in its investigation into the next level up from the businesses selling subscriptions – the publishers and others who profit from increased advertising rates that result from higher numbers of magazine subscribers. The USAO has closed this investigation without any indictments but not because of any lack of effort or veracity by Mr. Rahm and others.[4]

Prior to this offense, Mr. Rahm had no significant criminal history other than traffic offenses, all of which occurred many years ago. As indicated by the attached Declarations, he has been a good father, son, and brother. Of course, his biggest and most relevant "characteristic" is his post-stroke health. This is a very significant consideration in determining what sentence is "sufficient, but not greater than necessary."

*The need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment and to afford adequate deterrence to criminal conduct.* 18 U.S.C. § 3553(a)(2)(A)-(B).

Given the nature of Mr. Rahm's health concerns, a significant period of confinement, even if it is not in a typical prison but in home confinement, shows the seriousness of the offense, particularly when coupled with restitution of over $100 million. A sentence of incarceration in a BOP facility could result in further significant deterioration of Mr. Rahm's health, including the

---

[4] The Court will recall discussion of the cooperation of Defendant David Moulder regarding this same investigation at Mr. Moulder's sentencing.

8

65154508v3

very real possibility that he dies in prison, which would be an excessive and unjust punishment for this offense.

*The need to protect the public from further crimes of the defendant.* 18 U.S.C. § 3553(a)(2)(C).

Given Mr. Rahm's physical and mental limitations, there is no risk to the public that would require his incarceration in the BOP.

*The need to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.* 18 U.S.C. § 3553(a)(2)(D).

The primary need for Mr. Rahm is for adequate medical care. The opinions of Dr. Gibson and Ms. English are consistent in their conclusions that it is unlikely that the BOP can provide that care to a person with Mr. Rahm's medical conditions.

Dr. Gibson is a board-certified physician with over two decades of experience in correctional healthcare, public health, and occupational medicine, including as Clinical Director at the United States Medical Center for Federal Prisons in Springfield, Missouri. Dr. Gibson reviewed Mr. Rahm's medical records and then met with him in-person, along with Mr. Rahm's sister. Dr. Gibson reached five conclusions:

1. Mr. Rahm's severe physical and cognitive disabilities make prison inappropriate.
2. Mr. Rahm requires continuous care that prisons cannot provide.
3. Home confinement ensures continuity of specialized care.
4. Mr. Rahm's physical and cognitive limitations eliminate any public safety risk.
5. Incarceration would worsen Mr. Rahm's mental health.

(Doc. 2879, Dr. Gibson Report at p. 18).

Specifically, with respect to daily living activities, Dr. Gibson notes that prisons typically do not have the specialized care readily available to deal with Mr. Rahm's problems, prisons are

not designed for inmates with dual impairments (hemiplegia and hip fracture) such as Mr. Rahm suffers from, and that there are often delayed emergency responses to issues that a complex patient such as Mr. Rahm may require.

The seizures that Mr. Rahm experiences and the medications that he needs also present real problems in a prison setting. Prisons cannot provide the level of personalized care that is necessary, and he is at an increased risk of falling because he will not have a scooter and there is not the infrastructure to help prevent falls. With respect to seizures, Dr. Gibson concludes that Mr. Rahm's "profound neurological and physical impairments, significantly undermines his fitness for incarceration" and that "his condition presents substantial risks that are incompatible with the limitations of a correctional healthcare setting." (Doc. 2879, Dr. Gibson Report at p. 11).

Ms. English worked in the BOP for over 31 years in a variety of positions, including serving as Regional Director in the Northeast Region, managing 20 institutions and their wardens. In addition to serving as Warden at three facilities and Associate Warden at two facilities, she served as Assistant Director over the Health Services Division. In that position, she was responsible for medical, dental, and mental health services provided to adults in custody. (Doc. 2879, Nicole English Report).

Ms. English identified several problems that the BOP will have in providing an adequate environment and care for Mr. Rahm:

- Because of needs that would not be met and his likely assignment to a facility with inmates of all security levels, Mr. Rahm would be prone to extortion or other abuses at the hands of more seasoned inmates.

- BOP faces significant staffing shortages that limit the ability to deal with inmates with complicated health issues, such as Mr. Rahm.

- There are limited opportunities for treatment by specialists on staff, requiring appointments with outside providers which are harder to schedule.

65154508v3

- Prisoners are expected to function independently and there are limited resources for dealing with an inmate with Mr. Rahm's challenges.

- The centralized formulary used by BOP for medications often requires substitutions for the drugs used by the patient on the outside. This creates unique challenges for someone like Mr. Rahm who has a variety of medications. Further, he would not be allowed to have the device he uses to keep track of when to take a medication and be reliance on BOP, creating the chance of multiple repeats of the mistake made by the Sugar Creek authorities, and resulting in an increased number of seizures. It is unlikely that he will be allowed to use the nose spray that he uses to prevent or minimize oncoming seizures.

- The use of a scooter in the prison will not be allowed, making it much harder for him to get around and significantly increase the risk of falls.

- Essential tasks that are now provided by his caregivers, such as going to the bathroom, carrying food and cutting it up on his plate, and getting dressed will now have to be provided by fellow prisoners.

- He will receive much less frequent physical therapy.

(Doc. 2879, Nicole English Declaration at pp. 5-10).

Her conclusion is that placement outside of BOP, such as home detention, may provide the best care and surroundings to allow Mr. Rahm access to the care he needs. (*Id.* at ¶¶ 49-54).

The reports of both experts demonstrate the very real risks to Mr. Rahm's health to incarceration in a BOP facility. It is not conjecture as to what happens if a medication is missed – we saw the consequences following his arrest and initial incarceration. And that was just for one day. With twice a day dosages of his anti-seizure medication, there are 730 (2 x 365) opportunities each year for overtaxed and understaff BOP employees to miss a dose – to say nothing about the other medications he takes.

Imagine each day that he wakes and has to rely on another inmate to help him go to the bathroom and get dressed. In the event that Mr. Rahm is unable to get to the toilet in time and has an accident, who will be available to help him clean up the mess? Then he must navigate the

distance from his cell to the dining facility using a cane (likely too far for that) or being pushed by an inmate in a wheelchair and then find someone to carry his tray and cut his food for him. What are the potential costs to him of securing this assistance every single day and for every single meal?

The real, not imagined, potential for significant harm to Mr. Rahm is very high. A sentence of incarceration would not meet the statutory goal of providing medical care in the most efficient manner, nor does it sufficiently take into account the characteristics of this defendant.

> *The kinds of sentences available and the established sentencing range.* 18 U.S.C. § 3553(a)(3)-(4).

This factor requires courts "to consider sentences other than imprisonment." *Gall v. United States*, 552 U.S. 38, 59 (2007). For example, the Eighth Circuit has upheld a district court's downward variance to a sentence of ten years' supervised release, one year of home confinement, and other restrictions, based in part upon this factor. *United States v. Davis*, 20 F.4th 1217, 1221–22 (8th Cir. 2021) (sentence constituted "a substantial punishment" and the Supreme Court has noted § 3553(a)(3) requires sentencing courts to consider noncustodial sentences). While custodial sentences are qualitatively more severe than probationary sentences of equivalent terms, offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *Id.* In addition, the Court may also impose additional discretionary conditions as appropriate. 18 U.S.C. § 3563(b). These same conditions may be imposed during supervised release, including home confinement. 18 U.S.C. § 3583(d).

Mr. Rahm's adjusted offense level is 40 and, when combined with a criminal history Category I, makes Mr. Rahm's guidelines range 292-360 months. Mr. Rahm's adjusted offense level places him in Zone D in the sentencing table—calling for imprisonment. However, the Eighth Circuit has held where a sentence initially calls for imprisonment, a downward variance or

departure to probation is not per se unreasonable. *U.S. v. Wadena*, 470 F.3d 735, 738 (8th Cir. 2006) (rejecting contention that Guidelines require imprisonment for defendants whose offense level falls within Zone B or above within the sentencing table). "Such a rule would amount to the judicial elimination of a sentencing option that would otherwise be available under federal criminal statutes that do not impose mandatory imprisonment." *Id.*

Like in *Wadena*, Mr. Rahm's charge contains no mandatory minimum imprisonment term. *Id.* Also like in *Wadena*, the Eighth Circuit reviewed the District Court's consideration of the defendant's physical health when proscribing a downward sentence to probation. Because Wadena suffered from burdensome medical needs, including three dialysis treatments per week, a downward variance to probation was held as reasonable. *Id.* at 738-39.[5] As applied to Mr. Rahm, *Wadena* is instructive because, while Mr. Rahm's initial guideline falls within Zone D, he has already served at least some imprisonment when initially indicted. That test case demonstrates the potential outcome for a custodial sentence at this stage for Mr. Rahm—serious medical risk and complications leading to hospitalization. "[T]he overarching policy contained in [the Guidelines] is clear: in some situations, a district court may impose a non-prison sentence when a defendant has serious medical needs" through either a variance or a departure. *Id.* at 739. In Mr. Rahm's case a sentence that is "sufficient but not greater than necessary," in his specific circumstances should include a sentence of home detention under §§ 3553(a)(3)-(4).

*Any pertinent policy statement.* 18 U.S.C. § 3553(a)(5).

The Sentencing Commission Policy Statement concerning "physical condition," states:

---

[5] Wadena's guidelines range was eighteen to twenty-four months in prison, which is less than Mr. Rahm. *Id.* at 737. However, Wadena also had a prior federal conviction yielding a criminal history category II. *Id.* Mr. Rahm is a category I and, as discussed herein, suffers from substantially greater physical conditions that make imprisonment inappropriate in his case, including an emergency room visit in the twenty-four hours he previously was incarcerated after indictment and before his initial appearance.

65154508v3

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.
>
> U.S.S.G. § 5H1.4. Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction (Policy Statement).

The Eighth Circuit permits a downward departure based on a defendants' extraordinary physical impairment resulting in extreme vulnerability to victimization and serious injury in prison. *United States v. Long*, 977 F.2d 1264, 1277–78 (8th Cir. 1992); *United States v. Varner*, 678 F.3d 653 (8th Cir. 2012). While this Guideline departure "should be limited to exceptional circumstances," Mr. Rahm's health presents a case that merits a sentence of home detention. *U.S. v. Coughlin,* 500 F.3d 813, 818 (8th Cir. 2007).

In this Circuit, the sentencing court must consider three "questions" when deciding whether to depart under §5H1.4: (1) whether incarceration would impose more than the "normal hardship" on the defendant; (2) whether the defendant would face more than "the normal inconvenience of danger" from incarceration; and (3) whether the defendant's physical condition would have a "substantial present effect" on his functional ability while in prison. *United States v. Johnson*, 318 F.3d 821, 825–26 (8th Cir. 2003). The sentencing court must answer each question affirmatively, in order to make the downward departure. *United States v. Coughlin*, 500 F.3d 813, 818–19 (8th Cir. 2007). A defendant's physical condition must be "assessed in the light of the situation the defendant would encounter while imprisoned." *Johnson*, 318 F.3d at 826. As discussed, *supra*, within twenty-four hours of incarceration after indictment, Mr. Rahm suffered seizures requiring emergency hospitalization.

Mr. Rahm's case is the "unusual" instance where extraordinary physical impairment justifies the Court to depart downward because "home detention may be as efficient as, and less costly than, imprisonment" U.S.S.G. § 5H1.4. Because the answer to each of the three questions is affirmative, the Court should depart downward and grant Mr. Rahm a sentence of home detention. Where "the imposition of a term of imprisonment could be the equivalent of a death sentence," a downward departure is more than reasonable. *Long*, 977 F.2d at 1278 (affirming district court sentence departing three levels based on the discouraged factor of extraordinary physical impairment).

> *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.* 18 U.S.C. § 3553(a)(6).

While a sentence in which incarceration is effectively replaced by home detention may seem at odds with sentences given to other defendants in this case, the key word in this provision is "unwarranted." No other defendant comes close to suffering from the kind of medical problems that Mr. Rahm has. Mr. Rahm would gladly trade places health-wise with any other defendant and even serve his time in prison, if he knew that he was going to be healthy and be able to take care of himself and his family when he gets out.

> *The need to provide restitution to any victim(s).* 18 U.S.C. § 3553(a)(7).

Mr. Rahm has agreed to restitution in the amount of $103,189,961.

## Conclusion

Mr. Rahm has great remorse for his role in a very significant crime and regrets the damage he has caused. He does not mean for his request in this Memorandum to be considered as minimizing either his conduct or the victims' harm. But he did suffer a very serious stroke before he was indicted, the effects of which were multiplied by the 18 hours he lay in his hotel room, unable to call for help. The ramifications of that stroke are real and documented. He continues to

be reliant on caregivers for the most basic of human needs, help that will not be available in the federal prison system. He asks this Court to consider the Declarations of his caregivers and the experts who examined him and his records and to impose a sentence that incorporates home detention as an alternative to incarceration.

Dated: December 27, 2024	LATHROP GPM, LLP

By: */s/ Jean Paul Bradshaw*
	Jean Paul Bradshaw (#031800)

Jean Paul Bradshaw II, MO Bar #31800, *admitted pro hac vice*
Brian Fries, MO Bar #40830, *admitted pro hac vice*
Jackson R. Hobbs, MO Bar #71004, *admitted pro hac vice*
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108
Telephone: 816.460.5507
Telecopier: 816.292.2001
jeanpaul.bradshaw@lathropgpm.com
brian.fries@lathropgpm.com
jackson.hobbs@lathropgpm.com

Brian A. Dillon (#0386643)
Lathrop GPM LLP
80 South 8th Street
500 IDS Center
Minneapolis, MN 55402
Telephone: (612) 632-3000
Brian.dillon@lathropgpm.com

**ATTORNEYS FOR RUSSELL J. RAHM**